The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DUY T. MAI, | NO. 2:17-cv-00561 |
| Plaintiff | UNITED STATES' MOTION TO DISMISS |
| v. | |
| UNITED STATES OF AMERICA, et al. | Noted for Consideration on: July 14, 2017 |
| Defendants. | |

## I.   **INTRODUCTION**

Defendants the United States; the Department of Justice ("DOJ"); the Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF"); the Federal Bureau of Investigation ("FBI");

Jefferson B. Sessions III, as Attorney General; Andrew McCabe, as Acting Director of the FBI;[1]

and Thomas E. Brandon, as Acting Director of the ATF, (collectively "Defendants"), by and

through undersigned counsel, Annette L. Hayes, United States Attorney for the Western District

of Washington, and Jessica M. Andrade, Assistant United States Attorney for said District,

---

[1]     Plaintiff names former Director of the FBI James Comey.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Defendants request that Mr. McCabe be substituted for Mr. Comey.

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 1 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

respectfully submit this Motion to Dismiss.  Plaintiff is prohibited from purchasing a firearm under 18 U.S.C. 922 (g)(4) because he has been involuntarily committed for mental health treatment.  This prohibition does not deprive him of Constitutional rights under either the Second or Fifth Amendments.  First, the prohibition does not violate Plaintiff's Second Amendment rights under the Ninth Circuit's two-step inquiry because the challenged law does not burden conduct falling within the traditional scope of the Second Amendment's guaranty, and in any event, the challenged law survives appropriate means-end scrutiny.  Second, alleges no defect in his involuntary commitment proceeding, which resulted in the loss of his firearm right.  To the extent Plaintiff challenges the federal prohibition itself on due process concerns, such claims have been repeatedly dismissed by federal courts—where an amendment specifically delineates a right like the Second Amendment does, the right is more appropriately analyzed under that amendment, and not under due process or equal protection concerns.  *Nordyke v. King*, 644 F.3d 776, 794 (9th Cir. 2011).  Accordingly, the Plaintiff's claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6).[2]

## II.     FEDERAL STATUTORY AND REGULATORY BACKGROUND

Whether an individual is barred from purchasing a firearm under federal law is set forth by a series of restrictions in 18 U.S.C. § 922(g).  Under that provision, an individual "who has been committed to a mental institution" may not purchase a firearm. 18 U.S.C. § 922(g)(4).  Specifically, the statute provides:

---

[2]     It is also unclear whether Plaintiff has appropriately served the various defendants under Federal Rule of Civil Procedure 4(i).  Dismissal is therefore also appropriate under Federal Rule of Civil Procedure 12(b)(5).

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 2 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

> It shall be unlawful for any person ... who has been adjudicated as a mental defective or who has been committed to a mental institution ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

*Id.*[3]  Regulations issued by the ATF define these terms as follows:

> Adjudicated as a mental defective.
> (a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
> (1) Is a danger to himself or to others; or
> (2) Lacks the mental capacity to contract or manage his own affairs.
> (b) The term shall include -
> (1) A finding of insanity by a court in a criminal case; and
> (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b.
>
> &ast;        &ast;        &ast;
>
> Committed to a mental institution. A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution. (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b.

17 C.F.R. § 478.11.

In 2008, in the wake of the Virginia Tech University shootings, Congress passed the National Instant Criminal Backgrounds Check System ("NICS") Improvements Amendments Act ("NIAA").  Pub.L. No. 110–180, 122 Stat. 2559.  The NIAA authorizes federal grants to states to assist them in determining which individuals are eligible to purchase and possess

---

[3]      Section 922(g) also imposes firearm restrictions on several other groups of individuals, including convicted felons, § 922(g)(1); fugitives, § 922(g)(2); and domestic-violence misdemeanants, § 922(g)(9).

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 3 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

firearms and to aid them in supplying accurate information to federal databases. To be eligible for such grants, a state must certify to the Attorney General that it has implemented a relief-from-disabilities program under which an individual who "pursuant to state law" has been adjudicated mentally defective or has been "committed to a mental institution" may apply "for relief from the disabilities imposed" by 18 U.S.C. § 922(g)(4). §§ 103 & 105, 122 Stat. at 2568–69.

To be sufficient for federal relief, however, the state-implemented application for relief process must incorporate certain requirements. Similar to the standards required by the federal relief-from-disabilities program, a sufficient state program "shall grant the relief" if "the circumstances regarding the disabilities ... and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.* The NIAA requires that a "State court . . . or other lawful authority" reviewing a petition for relief from firearms disabilities must consider at least three factors in determining whether to grant or deny the requested relief: (1) "the circumstances regarding" the petitioner's firearms disability imposed by 18 U.S.C. § 922(g)(4); (2) the petitioner's "record" (i.e., mental health and criminal history records); and (3) the petitioner's "reputation." NIAA § 105(a)(2). Second, the NIAA also requires that when a "State court . . . or other lawful authority" grants a petitioner relief from a firearms disability, the court must make at least two specific findings. The state authority must find that the petitioner "will not be likely to act in a manner dangerous to public safety," and that "the granting of the relief would not be contrary to the public interest." NIAA § 105(a)(2).

Washington's state restoration statute is set forth in RCW 9.41.047, and pre-dates and is otherwise noncompliant with the NIAA.  *See* Washington Attorney General's White Paper at 12-13, *available at* http://www.atg.wa.gov/firearms-access-washington (noting noncompliance with NIAA and need for amendment, which has thus far failed in the state legislature).  Specifically, the provisions for restoration of rights after involuntary commitment do not have the same rigorous requirements recommended by the federal statute.  *Id.*

## III.   RELEVANT FACTS

In October 1999, Plaintiff was involuntarily committed for mental health treatment. Complaint ¶ 1 (Dkt. No. 1).  Plaintiff concedes that he thereby lost his firearm rights under 18 U.S.C. § 922(g)(4).  *Id.*  Plaintiff does not allege that his involuntary commitment does not constitute "commit[ment] to a mental institution" under the statute, nor does he allege any defect in his involuntary commitment proceeding.  *See generally* Complaint at Dkt. No. 1.  Plaintiff alleges that he has obtained a restoration order under RCW 9.41.040, but does not attach that order or make any allegations about its contents.  *Id.*  Plaintiff did attempt to purchase a firearm and NICS informed him he was denied pursuant to 18 U.S.C. § 922(g)(4).  Complaint ¶ 11. Thereafter, Plaintiff filed this suit.  Complaint at 5-6.

## IV.   LEGAL STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim [for] relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  In reviewing a Rule 12(b)(6) motion, the court accepts as true all well

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 5 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

pleaded facts in the complaint, but disregards legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678.

## V.   ARGUMENT

### A.   Plaintiff Cannot State a Legally Cognizable Second Amendment Claim

Second Amendment rights are not unlimited.  In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), after determining that the Second Amendment conferred an individual right to keep and bear arms, 554 U.S. at 595, the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. In conducting this analysis, the court indicated that it must determine whether the possession of operable weapons in the home fell within "the historical understanding of the scope of the [Second Amendment] right." *Id.* at 625.  *Heller* also specifically stated that the Second Amendment does not preclude certain "longstanding prohibitions" and "presumptively lawful regulatory measures," such as "prohibitions on the possession of firearms by felons and the mentally ill," among other regulations.  *Id.* at 626–27, 627 n. 26 (internal citations and quotations omitted).

Similar to many other circuits, the Ninth Circuit has "discerned from *Heller*'s approach a two-step Second Amendment inquiry." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014) (*citing United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013)); *see also, e.g., United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). This two-step inquiry "(1) asks whether the challenged law burdens conduct protected by the

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 6 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny."

*Jackson*, 746 F.3d at 960 (*citing Chovan*, 735 F.3d at 1136).  Applying the standard here, this

case should be dismissed because: (1) as applied to Plaintiff, Section 922(g)(4) does not impact

rights within the scope of the Second Amendment's protection; and (2) in any event, Section

922(g)(4) as applied to Plaintiff passes muster under the appropriate level of means-end

constitutional scrutiny.

**B.      Plaintiff's Claim Involves Conduct that Falls Outside the Scope of the Second Amendment's Protection**

In determining whether a given regulation falls within the scope of the Second

Amendment under the first step of this inquiry, "we ask whether the regulation is one of the

'presumptively lawful regulatory measures' identified in *Heller*, or whether the record includes

persuasive historical evidence establishing that the regulation at issue imposes prohibitions that

fall outside the historical scope of the Second Amendment." *Jackson*, 746 F.3d at 960 (first

quoting *Heller*, 554 U.S. at 627 n.26, 128 S.Ct. 2783; then citing *Chovan*, 735 F.3d at 1137).  In

*Heller*, the Court provided a non-"exhaustive" list of "presumptively lawful regulatory

measures," including "longstanding prohibitions on the possession of firearms by felons and the

mentally ill," and explained that "nothing in [its] opinion should be taken to cast doubt on" such

measures.  *Id.* at 626-27 & n.26. The Court further noted that "[w]e identify these *presumptively*

*lawful regulatory measures* only as examples; our list does not purport to be exhaustive."

*Heller,* 128 S.Ct. at 2817, n.26 (emphasis added). The Court "repeat[ed] those assurances" in

*McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).  Thus, those who have been

recognized as "mentally ill," as stated in *Heller*, are categorically different from the individuals

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 7 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

who have a fundamental right to bear arms, and regulations restricting their firearm rights are "presumptively lawful."  As the Ninth Circuit has since recognized, where the regulation at issue is one of the "presumptively lawful measures" identified in *Heller*, the inquiry ends under the first step of the two-step analysis.  *Jackson*, 746 F.3d at 960.  In other words, because of Section 922(g)(4)'s status as a "longstanding prohibition" on the possession of firearms by the "mentally ill," it does not burden conduct protected by the Second Amendment.

The Ninth Circuit applied similar reasoning in rejecting a Second Amendment challenge to 18 U.S.C. § 922(g)(1), the provision of the GCA that prohibits convicted felons from purchasing or possessing firearms.  In *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), the court ruled that Section 922(g)(1) did not violate the Second Amendment because restrictions on possession of firearms by felons was a "presumptively lawful" regulation listed by *Heller*, and as such "felons are categorically different from the individuals who have a fundamental right to bear arms…" *Id.* at 1115.  Notably, in *Vongxay*, the Ninth Circuit expressly rejected the argument that the *Heller* "presumptively lawful" language was dicta.  *Id.*

This was also the conclusion of the only court within the Ninth Circuit to take up the issue with regard to Section 922(g)(4) thus far.  In *Petramala v. United States Dept. of Justice*, the District of Arizona concluded that a rejection of a gun purchase under Section 922(g)(4) did not violate the Second Amendment.  *Petramala v. United States Dept. of Justice*, No. CV 10–2002–PHX–FJM, 2011 WL 3880826 (D.Ariz. Sept. 2, 2011).  The court referenced *Heller*'s acknowledgement that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" remain valid. *Id.* (quoting *Heller*, 554 U.S. at 626).  The court concluded that Section 922(g)(4) places "a constitutionally valid limitation on [plaintiff's] possession of

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 8 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

firearms." *Id.*  This reasoning was confirmed by the Ninth Circuit in an unpublished decision. *Petramala v. U.S. Dep't of Justice*, 481 F. App'x 395, 396 (9th Cir. 2012).

This result is also confirmed by the historical record.  The Court in *Heller* recognized as "the predecessor to our Second Amendment," 554 U.S. at 593, the right to arms in the 1689 English Declaration of Rights, which was understood to be consistent with the disarmament of "any person or persons" judged "dangerous to the Peace of the Kingdome" under the 1662 Militia Act, 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.).[4]  *See* Joyce Lee Malcolm, *To Keep and Bear Arms* 123 (1994).  In the American colonies, disarmament of individuals perceived to be dangerous also was frequent, and such actions were not viewed as inconsistent with the right to bear arms.  *See id.* at 140-41; *see also Vongxay*, 594 F.3d at 1118; *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010).  Similarly, one of the "Second Amendment precursors" identified by *Heller* as "highly influential," 554 U.S. at 603-04, was a proposal offered by the Pennsylvania antifederalist faction at the Pennsylvania Convention, providing that "the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." *The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents*, 1787, *reprinted in* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971).

---

[4]      Upon the Court's request, Defendants will submit copies of any of the cited historical reference materials, as well as copies of the empirical studies cited.

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 9 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Historical sources further show that those with mental disturbances fall among those who would have been perceived as posing a "real danger of public injury," if permitted to bear arms. *See* Schwartz, *The Bill of Rights*, at 665; *see also United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001). For example, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry" that did not include such persons. *Yancey*, 621 F.3d at 684-85. Significantly, persons with a history of mental disturbance were often physically isolated from the community at large through confinement at home or in welfare and penal institutions. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5-21, 29, 43 (1994). Thus, "the absence of historical statutory prohibitions on firearm possession [by such persons] may have been the consequence of the fact that in eighteenth-century America, justices of the peace were authorized to lock up" persons deemed too dangerous due to mental illness," *Yancey*, 621 F.3d at 685 (citation omitted), obviating the need for laws formally disarming them.

Plaintiff thus falls within a category of individuals whose possession of firearms may be regulated without offending the Second Amendment, as historically understood. Applying this analysis at the first step of the two-step framework, because persons previously involuntarily committed for reason of prior mental illness are "disqualified from exercising their Second Amendment rights, … the Second Amendment affords no protection" for the possession of firearms by such persons. *Marzzarella*, 614 F.3d at 91-92. Accordingly, Plaintiff's claim fails the first prong of the Second Amendment inquiry adopted by the Ninth Circuit because Section

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 10 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  922(g)(4) does not "impose[] a burden on conduct falling within the scope of the Second

2  Amendment's guarantee," *id.* at 89.[5]

3

4  **C.**   **Even if the Second Amendment were Implicated by Plaintiff's Claims,**
**Section 922(g)(4) is Nonetheless Consistent with his Constitutional Rights**

5  **Because it Satisfies the Appropriate Level of Scrutiny**

6  Even if the Court were to reject the analysis above, Plaintiff's claim still would fail under

7  the second step of the two-pronged approach established by the Ninth Circuit.  Under the second

8  step of the Second Amendment inquiry, the court must apply an appropriate level of scrutiny.

9  *Chovan*, 735 F.3d at 1136. When ascertaining the appropriate level of scrutiny, "just as in the

10  First Amendment context," we consider: "(1) 'how close the law comes to the core of the Second

11

12  Amendment right' and (2) 'the severity of the law's burden on the right.' " *Chovan*, 735 F.3d at

13  1138 (quoting *Ezell*, 651 F.3d at 703).

14

15

16

17  _____

    [5]      Ninth Circuit precedent counsel that the foregoing analysis, coupled with the recognizing in

18  Heller that Section 922(g)(4) is a "presumptively lawful regulatory measure[]," *Heller*, 554 U.S. at 626 &
627 n.26, forecloses  any opportunity for plaintiff to assert a successful, as-applied constitutional

19  challenge.  In *Vongxay* and *Petramala*, the Court of Appeals considered the nature of the respective
plaintiff's firearm disabilities in historical context, concluding that such analysis sufficed to support a

20  regulatory measure "presumptively lawful" under *Heller*.  *See Vongxay* 594 F.3d 1111 (9th Cir. 2010);
*Petramala*, 481 F. App'x 395, 396 (9th Cir. 2012); *accord United States v. McRobie,* No. 08–4632, 2009

21  WL 82715, *1 (4th Cir. Jan.14, 2009) (upholding § 922(g)(4) post-*Heller* because it "specifically
cautioned that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the

22  possession of firearms by felons and the mentally ill.'" (internal citations omitted)).  These precedents
demonstrate there is no need to consider Plaintiff's individual circumstances.  Even if the Court were to

23  consider those circumstances, however, Plaintiff has not pleaded sufficient facts to distinguish himself
from those of persons historically barred from Second Amendment protections.  Indeed the complaint

24  offers only conclusory allegations that Plaintiff was released from involuntary commitment in 2000, and
that he no longer takes medication to control his condition.  Complaint ¶ 2, 8.  Plaintiff says nothing of

25  what condition he suffered from for which he was involuntarily committed what treatment he has
obtained, or why he would no longer be a danger to others were he to possess a firearm.  *See generally*,

26  Complaint.  Plaintiff's use of an irradiator for his work is irrelevant to his firearm rights under the GCA.
Complaint ¶ 4.  The purposes of the background check requirement for irradiators is to prevent theft or

27  diversion, not public or personal safety.  37 C.F.R. § 37.1.

28

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 11 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

### 1. Intermediate Scrutiny Applies to the Second Step of the As-Applied Challenge to Section 922(g)(4)

Most courts to consider a challenge to a federal firearm prohibition under Section 922(g), including the Ninth Circuit, have applied an intermediate standard of review to evaluate Second Amendment challenges.  *See Chovan*, 735 F.3d at 1138 (Ninth Circuit applying intermediate scrutiny to challenge of constitutionality of banning possession rights for domestic violence offenders).  Application of intermediate scrutiny is appropriate because "[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test . . . , which can be exercised without creating a direct risk to others." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015).  Indeed, a more demanding standard would be inconsistent with *Heller*'s recognition that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful."  554 U.S. at 626 & 627 n.26; *see also United States v. Mahin*, 668 F.3d 119, 123 (4th Cir. 2012) ("[C]ourts of appeals have generally applied intermediate scrutiny" when evaluating post-*Heller* challenges to the firearm restrictions at 18 U.S.C. § 922(g)).

### 2. Section 922(g)(4) Substantially Relates to the Important Governmental Interest of Preventing Firearm Violence—Including Suicide—and Protecting Public Safety

To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Section 922(g)(4), as applied to Plaintiff, clearly meets that standard.

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 12 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

i.     **Section 922(g)(4) Serves Important and Compelling Government Interests**

3

A primary governmental objective underlying § 922(g)(4) is to protect the public from

4

"armed mayhem" in the form of firearms violence, and thereby to preserve peace and public

5

safety. *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc). Protecting public

6

7

safety and combating crime are well-established *compelling* governmental interests. *See United*

8

*States v. Salerno*, 481 U.S. 739, 748 (1987) (noting that the Supreme Court has "repeatedly held

9

that the Government's regulatory interest in community safety can, in appropriate circumstances,

10

outweigh an individual's liberty interest"); *Schall v. Abrams*, 467 U.S. 253, 264 (1984) ("The

11

12

legitimate and compelling state interest in protecting the community from crime cannot be

13

doubted.") (citation omitted)).

14

Congress enacted Section 922(g)(4) following a multi-year inquiry into violent crime that

15

revealed "a serious problem of firearms misuse in the United States." S. Rep. No. 89-1866, at 3,

16

17

53. Among other things, Congress's investigation of firearm-related killings also revealed that

18

firearms "were the agency of death" in over half of all suicides. S. Rep. No. 88-1340, at 3. The

19

evidence before Congress showed that "[i]n 1966, 6,855 Americans were murdered by gun[]

20

[whereas] 10,407 suicides and 2,600 fatal accidents involved firearms," 114 Cong. Rec. 21,774

21

22

(statement of Rep. Rosenthal), and that "[i]n the last decade, 92,747 Americans took their own

23

lives with a firearm, reflecting the fact that the surest and easiest way to commit suicide is with a

24

gun." *Id.* at 21,811 (statement of Rep. Schwengel).

25

To address these problems, Congress undertook "to regulate more effectively interstate

26

commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or

27

28

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 13 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

those who might misuse them."  S. Rep. No. 89-1866, at 1; *see also* Cong. Rec. 13,219

(statement of Sen. Tydings) ("Within the context of Federal control of traffic in firearms, States

and localities can move effectively to keep these lethal weapons out of the hands of criminals,

drug addicts, mentally disordered persons, juveniles, and other persons wose possession of them

is too high a price in danger to us all to allow.").  Congress sought to "cut down or eliminate

firearms deaths caused by persons who are not criminals, but who commit sudden,

unpremeditated crimes with firearms as a result of mental disturbances." 114 Cong. Rec. 21,829

(statement of Rep. Bingham).

To that end, Congress enacted statutory provisions addressed to "individuals who by their

previous conduct or mental condition or irresponsibility have shown themselves incapable of

handling a dangerous weapon in the midst of an open society," 114 Cong. Rec. 21,809-10

(statement of Rep. Tenzer), such as "persons with a history of mental disturbances." *Id.*  At

21,784 (statement of Rep. Celler).  These provisions include Section 922(g)(4), which makes it

unlawful for any person "who has been committed to a mental institution . . . . to receive any

firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

The government's interest "in protecting the community from crime" is "legitimate and

compelling," *Schall*, 467 U.S. at 264, as is its interest in preventing suicide.  *See Washington v.

Glucksberg*, 521 U.S. 702, 735 (1997) (recognizing the government's interest in suicide

prevention as "unquestionably important and legitimate"); *In re Grand Jury Subpoena John Doe

v. United States*, 150 F.3d 170, 172 (2d Cir 1998).

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 14 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

ii.   **Section 922(g)(4) Substantially Relates to Protecting Public Safety**

A substantial relationship exists between protecting public safety (e.g., by preventing violent crime and suicide), on the one hand, and prohibiting firearms possession by persons (such as Plaintiff), who have been involuntarily committed based on a finding that mental illness creates a reasonable expectation of serious physical injury.

Congress's decision to adopt a prophylactic prohibition against the "presumptively risky" category of individuals who have been involuntarily committed was a justifiable response to the problem of firearms violence that it sought to address. *See Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983) (discussing Section 922(g)(4), holding regarding Sections 922(g)(1) and (h)(1) overruled in part by the Firearms Owners' Protection Act, Pub.L. 99-308, sec. 101, 100 Stat. 449). "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the legislature's predictive judgments.'" *Drake v. Filko*, 724 F.3d 426, 436-37 (3rd Cir. 2013) (*quoting Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). "In the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys.,* 512 U.S. at 665).

The Supreme Court has "recognized and given weight" to Congress's "broad prophylactic purpose" in enacting the restrictions on firearms possession in 18 U.S.C. § 922(g). *Dickerson*, 460 U.S. at 118. Congress sought to limit firearm availability "to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S.

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 15 of 24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

814, 824 (1974).  The legislative "intent in enacting []§ 922(g) . . . was to keep firearms out of

the hands of presumptively risky people."  *Dickerson*, 460 U.S. at 112 n.6 (emphasis added); *see*

*Barrett v. United States*, 423 U.S. 212, 220 (1976) (citing legislative history reflecting a concern

with "keeping firearms out of the hands of categories of potentially irresponsible persons").

Consistent with this intent to keep firearms out of the hands of presumptively risky

persons, 18 U.S.C. § 922(g) is not limited to persons who have already committed dangerous or

violent acts.  In the case of Section 922(g)(4), Congress relied on a history of involuntary

commitment or adjudicated mental illness as the basis for the prophylactic firearm prohibition.

*See* 114 Cong. Rec. 14,773 (1968) (Sen. Long) (stating that mentally ill individuals, "by their

actions, have demonstrated that they are dangerous, or that they *may become dangerous*"

(emphasis added)).  In enacting Section 922(g)(4), Congress certainly was aware that "a person

committed to a mental institution later may be deemed cured and released"; nevertheless, "[t]he

past . . . commitment disqualifies.  Congress obviously felt that such a person [who had

previously been committed to a mental institution], though unfortunate, was too much of a risk to

be allowed firearms privileges." *Dickerson*, 460 U.S. at 116.

Congress acted logically in relying on the above criteria as relevant indicia of a future

risk of violence, rather than attempting to craft a regime mandating individualized predictions of

future violence.  Such individualized predictions would impose extraordinarily difficult, if not

impossible, burdens on government officials and likely would be no more than a guess.  And

Congress was entitled to adopt a statutory scheme that relied instead on objective, historical data.

*See Weinberger v. Salfi*, 422 U.S. 749, 751 (1975) ("Congress . . . could rationally have

concluded . . . that the expense and other difficulties of individual determinations justified the

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 16 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

inherent imprecision of an objective, easily administered prophylactic rule.").  Moreover, the Supreme Court has recognized the inherent difficulty in making such "free floating" and particularized assessments of dangerousness.  *See Estelle v. Smith*, 451 U.S. 454, 472 (1981).

Congress appropriately determined that persons who have previously been involuntarily committed pose an unacceptable risk of misusing firearms because they are susceptible to future episodes of mental illness.  Indeed, the GCA "is designed to prohibit the ownership of firearms not only by individuals who have already committed dangerous acts, but also by those with a *potential* for violence." *United States v. Waters*, 23 F.3d 29, 34 (2d Cir. 1994) (emphasis added). To achieve that purpose, Congress reasonably relied not on actual evidence of future dangerousness but on past commitment or adjudication of mental illness.  It has no bearing that, under this framework, some individuals to whom Section 922(g)(4) is applicable may not engage in, or even contemplate, gun violence.  Congress has chosen to err on the side of caution, and it was entitled to conclude that such caution is warranted where to do otherwise "could have devastating consequences for innocent citizens." H.R. Rep. No. 102-618, at 14 (1992).  This clearly satisfies intermediate scrutiny, which requires only that the degree of fit between the challenged law and the governmental interest it serves be "reasonable," not perfect. *Drake*, 724 F.3d at 436.

Beyond the legislative history, empirical evidence further demonstrates that Congress acted reasonably in determining that persons who have been involuntarily committed pose an

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 17 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

enhanced risk of violence.[6]  Research suggests that persons who suffer from significant mental illness pose an increased risk of harm to themselves or others. *See* 8 Seena Fazel & Martin Grann, *The Population Impact of Severe Mental Illness on Violent Crime*, 163 Am. J. Psychiatry 1397, 1401 (Aug. 2006) (reporting increased risk "in patients with severe mental illness compared with the general population").  A National Institute of Mental Health ("NIMH") study showed that patients with serious mental illness "were two to three times as likely as people without such an illness to be assaultive.  In absolute terms, the lifetime prevalence of violence among people with serious mental illness was 16% . . . compared with 7% among people without mental illness."  Richard A. Friedman, *Violence and Mental Illness – How Strong Is the Link?*, 355 New Eng. J. Med. 2064, 2065 (Nov. 2006).  Other research has shown that discharged mental patients with coexisting substance-abuse diagnoses have a dramatically increased violence rate. *See* Henry J. Steadman *et al.*, *Violence by People Discharged From Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods*, 55 Arch. Gen. Psychiatry 393, 393-401 (May 1998).  A more recent study indicates that, irrespective of substance abuse status, individuals with severe mental illness were more likely to be violent than those without any history of mental or substance abuse disorder. *See* Richard Van Dorn *et*

---

[6]     Defendants have no additional obligation to produce concrete evidence in support of Congress's legislative judgment, and the Court need not consider such evidence to § 922(g)(4) as applied to Plaintiff. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (noting that even under strict scrutiny, some restrictions on speech can be upheld "based solely on history, consensus, and 'simple common sense.'").  However, such evidence is provided here to the extent it is helpful for the Court's analysis. *See, e.g.*, *United States v. Staten*, 666 F.3d 154, 163- 67 (4th Cir. 2011) (relying on empirical data in conducting Second Amendment means-end analysis); *Skoien*, 614 F.3d at 643-44 (same).

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 18 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*al.*, *Mental Disorder and Violence: Is There a Relationship Beyond Substance Use?*, 47 Soc. Psychiatry & Psychiatric Epidemiology 487 (Mar. 2012).

Persons with mental illness also have a significantly increased risk of suicide.  The NIMH reports that over 90 percent of persons who commit suicide have a mental disorder, a substance-abuse disorder, or both. NIMH, *Suicide in the U.S.: Statistics and Prevention*.[7]  The suicide rate for persons with active psychiatric disorders is 7 to 10 times the rate for the general population. *See* Bryan L. Tanney, *Psychiatric Diagnoses and Suicidal Acts*, in Ronald W. Maris *et al.*, *Comprehensive Textbook of Suicidology* 339 (2000).  Consistently, a high suicide rate exists among persons who have previously been committed. *See* 1 Virginia A. Hiday, *Civil Commitment: A Review of Empirical Research*, 6 Behav. Sci. & L. 15, 25 (Winter 1988) (among 189 patients who entered commitment process, 10 committed suicide within 19 months).  And firearms are much more likely to cause injury or death than other available weapons, such as knives. As one commentator has noted, "[a] suicide attempt with a firearm rarely affords a second chance," while "[a]ttempts involving drugs or cutting, which account for more than 90% of all suicidal acts, prove fatal far less often." Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New England J. Med. 989, 989-90 (Sept. 2008).

Because there are an estimated 12 to 25 attempted suicides for every suicide death, the inference is strong that removing firearms from the hands of mentally ill persons can save lives. *See* Joseph R. Simpson, *Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by Individuals With a History of Treatment for Mental Illness*, 35 J. Am. Acad.

---

[7]     *Available at* http://adhclinic.com/health_topics/suicide_prevention/suicide-in-the-us.html.

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 19 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Psychiatric Law 330, 338 (2007) (concluding that "individuals with psychiatric diagnoses may

be at higher risk of suicide if there are firearms in their households"); 2 Mark A. Ilgen *et al.*,

*Mental Illness, Previous Suicidality, and Access to Guns in the United States*, 59 Psychiatric

Service 198, 198- 200 (2008) (explaining that restricting access to lethal means is one of only

two suicide interventions with reasonable empirical support).  Additional examination of data

by suicide method revealed that:

> [h]aving a gun in the home was a strong risk factor for gun-related suicide . . . but
> was inversely related to committing suicide with a nonfirearm method . . . . That
> is, persons with a gun in the home were more likely than others to use a gun to
> commit suicide and less likely than others to commit suicide by means of drug
> overdose, hanging, or other method . . . .

Douglas J. Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A*

*National Case-Control Study*, 41 Ann. Emerg. Med. 771, 777 (June 2003).

Accordingly, for all of these reasons, the fact that Plaintiff has been committed to a

mental institution, defeats any claim that Section 922(g)(4) is not substantially related to

preventing him from future violent crime or suicide. This outcome reflects Congress's

reasonable determination that "such a person, though unfortunate, was too much of a risk to be

allowed firearms privileges." *Dickerson*, 460 U.S. at 116.

Even were the Court to accept as true Plaintiff's conclusory allegations – which it should

not – that he is "socially-responsible, well balanced" and that he is "no longer … mentally ill."

Complaint ¶¶ 8, 15, it would not affect the requisite fit between Section 922(g)(4) and

Congress's objectives.  As the Fourth Circuit recognized when rejecting an as-applied Second

Amendment challenge to an analogous restriction in 18 U.S.C. § 922(g)(8): "[T]he prohibitory

net case by [the statute] may be somewhat over-inclusive given that not every person who falls

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 20 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

within . . . it would misuse a firearm . . . if permitted to possess one," but "[t]his point does not undermine the [statute's] constitutionality . . . because it merely suggests that the fit is not a perfect one[] [and] a reasonable fit is all that is required under intermediate scrutiny." *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012); *see also Drake*, 724 F.3d at 436 (explaining that "'the fit' between the asserted interest and the challenged law need not be 'perfect,' [only] 'reasonable'"). In sum, the restriction imposed by § 922(g)(4) is a reasonable fit for the government's objective of preventing firearms violence, including suicide, and protecting public safety. Plaintiff's challenge to application of this statute should be dismissed with prejudice.

### D.   Plaintiff's Due Process Claim Should Also be Dismissed.

First and foremost, Plaintiff's complaint fails to state a claim for a violation of due process because Plaintiff alleges absolutely no defect with the involuntary commitment process under which he lost his firearm rights. *See generally* Complaint (Dkt. No. 1). The Ninth Circuit affirmed the District of Arizona's reasoning in a similar case, *Petramala v. U.S. Dep't. of Justice*, holding that the plaintiff had no due process claim with respect to Section 922(g)(4) because his commitment proceeding satisfied due process. 481 F. App'x 395, 396 (9th Cir. 2012). Accordingly, because there is no procedural defect with the commitment proceeding— the actual proceeding that resulted in the deprivation of Plaintiff's firearm rights—Plaintiff has no due process claim.

If Plaintiff is arguing that 18 U.S.C. §922(g)(4) deprives him of his firearm rights without due process on its own, such arguments have repeatedly been dismissed by federal courts. As the Ninth Circuit has commented, "although the right to keep and to bear arms for self-defense is

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 21 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a fundamental right, that right is more appropriately analyzed under the Second Amendment."

*Nordyke v. King*, 644 F.3d 776, 794 (9th Cir.2011) (internal citation omitted), vacated by 681

F.3d 1041 (9th Cir.2012) (en banc) (affirming the district court's decision to dismiss the Second

Amendment claim).  In *Nordyke* the Ninth Circuit referred to the Supreme Court's opinion in

*Albright v. Oliver*, which stated, "[w]here a particular Amendment 'provides an explicit textual

source of constitutional protection' against a particular sort of government behavior, 'that

Amendment, not the more generalized notion of 'substantive due process,' must be the guide for

analyzing these claims." 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994)

(quoting *Graham v. Connor,* 480 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989)).[8]  Plaintiff's due

process claim should thus be dismissed.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that Plaintiff's claims

be dismissed, without costs to be awarded to either party.

/

/

/

/

/

---

[8]      In addition, the Sixth Circuit has specifically declined to consider claims that "conflate the enumerated Second Amendment right with Equal Protection and Due Process protections under the Fifth Amendment." *United States v. Carey,* 602 F.3d 738, 741 n. 2 (6th Cir.2010) (reviewing appellant's Second Amendment argument but refusing to consider his more general due process and equal protection claims).  The Middle District of Pennsylvania has ruled similarly.  *Keyes v. Lynch*, 195 F. Supp. 3d 702, 723 (M.D. Pa. 2016).

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 22 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2   DATED this 19th day of June, 2017.

3                                        Respectfully submitted,

4
                                         ANNETTE L. HAYES
5                                        United States Attorney

6                                        s/ Jessica Andrade
7                                        JESSICA ANDRADE, WSBA #39297
                                         Assistant United States Attorney
8                                        United States Attorney's Office
9                                        700 Stewart Street, Suite 5220
                                         Seattle, Washington 98101-1271
10                                       Phone:  206-553-7970
                                         Fax:  206-553-4073
11                                       Email:  jessica.andrade@usdoj.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

The undersigned hereby certifies that she is an employee in the Office of the United

3

States Attorney for the Western District of Washington and is a person of such age and discretion

4

as to be competent to serve papers;

5

6

That on the below date she electronically filed the foregoing document(s) with the Clerk

7

of Court using the CM/ECF system, which will send notification of such filing to the following

8

ECF participants:

9

10

Vitaliy Kertchen
KERTCHEN LAW PLLC

11

711 COURT A
SUITE 104

12

TACOMA, WA 98402
253-905-8415

13

Email: vitaliy@kertchenlaw.com

14

She also certifies that on the below date she served copies of the foregoing document(s)

15

on the following non-ECF participants by depositing copies of the document(s) in the United

16

States mail, postage prepaid, addressed as follows:

17

-0-

18

DATED this 19th day of June, 2017.

19

20

s/ Rebecca Eaton
REBECCA EATON, Paralegal

21

United States Attorney's Office
700 Stewart Street, Suite 5220

22

Seattle, Washington 98101-1271
Phone:  206-553-7970

23

Fax:  206-553-4067

24

Email:  rebecca.eaton@usdoj.gov

25

26

27

28

UNITED STATES' MOTION TO DISMISS
Case No. 2:17-cv-00561
Page 24 of  24

UNITED STATES ATTORNEY
700 STEWART ST., SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970