FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DUY T. MAI,<br>　　　*Plaintiff-Appellant*,<br><br>　　　v.<br><br>UNITED STATES OF AMERICA;<br>UNITED STATES DEPARTMENT OF<br>JUSTICE; BUREAU OF ALCOHOL,<br>TOBACCO, FIREARMS, AND<br>EXPLOSIVES; FEDERAL BUREAU<br>OF INVESTIGATION; WILLIAM P.<br>BARR, Attorney General;<br>CHRISTOPHER A. WRAY, as<br>Director of the Federal Bureau of<br>Investigation; REGINA<br>LOMBARDO, as Acting Director<br>of the Bureau of Alcohol,<br>Tobacco, Firearms, and<br>Explosives,<br>　　　　　*Defendants-Appellees.* | No. 18-36071<br><br>D.C. No.<br>2:17-cv-00561-RAJ<br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted December 11, 2019
Seattle, Washington

2                    MAI V. UNITED STATES

Filed March 11, 2020

Before:  Susan P. Graber and Ronald M. Gould, Circuit
Judges, and David A. Ezra,* District Judge.

Opinion by Judge Graber

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's dismissal of a
42 U.S.C. § 1983 complaint containing an as-applied Second
Amendment challenge to 18 U.S.C. § 922(g)(4), which
prohibits plaintiff from possessing firearms due to his
involuntary commitment in 1999 to a mental institution for
more than nine months after a Washington state court found
plaintiff to be both mentally ill and dangerous.

Plaintiff argued that § 922(g)(4)'s continued application
to him despite his alleged return to mental health and
peaceableness violated the Second Amendment.  The panel
held that, assuming (without deciding) that § 922(g)(4)'s
prohibition burdens Second Amendment rights, intermediate
scrutiny applied.  The panel also held that the prohibition on
the possession of firearms by persons, like plaintiff, whom a

---

* The Honorable David A. Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

state court has found to be both mentally ill and dangerous is a reasonable fit with the government's indisputably important interest in preventing gun violence.  Scientific evidence supported the congressional judgment that those who have been committed involuntarily to a mental institution still pose an increased risk of violence even years after their release from commitment.  The panel therefore concluded that Section 922(g)(4)'s continued application to plaintiff did not violate the Second Amendment.

## COUNSEL

Vitaliy Kertchen (argued), Tacoma, Washington, for Plaintiff-Appellant.

Abby C. Wright (argued) and Michael S. Raab, Appellate Staff; Brian T. Moran, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

## OPINION

GRABER, Circuit Judge:

Plaintiff Duy Mai recently sought to buy a firearm, but federal law barred him from doing so.  A number of years ago, Plaintiff was committed involuntarily, for more than nine months, to a mental institution after a Washington state court found him to be both mentally ill and dangerous.  Title 18 U.S.C. § 922(g)(4) prohibits the possession of firearms by those, like Plaintiff, whom a state court committed

4                    MAI V. UNITED STATES

involuntarily to a mental institution.  Plaintiff concedes that the statutory prohibition on his possession of firearms during the period of his commitment was constitutional under the Second Amendment.  But Plaintiff here brings an as-applied challenge to § 922(g)(4), arguing that its *continued* application to him despite his alleged return to mental health and peaceableness violates the Second Amendment.  We hold that, assuming (without deciding) that § 922(g)(4)'s prohibition burdens Second Amendment rights, intermediate scrutiny applies.  We also hold that the prohibition on the possession of firearms by persons, like Plaintiff, whom a state court has found to be both mentally ill and dangerous is a reasonable fit with the government's indisputably important interest in preventing gun violence.  Scientific evidence supports the congressional judgment that those who have been committed involuntarily to a mental institution still pose an increased risk of violence even years after their release from commitment.  Section 922(g)(4)'s continued application to Plaintiff does not violate the Second Amendment.  We therefore affirm the district court's dismissal of this action.

BACKGROUND[1]

In October 1999, a Washington state court committed Plaintiff involuntarily for mental health treatment after he threatened himself and others.  The state court determined that Plaintiff was *both* mentally ill *and* dangerous.  Plaintiff's

---

[1]  Because we are reviewing the dismissal of a complaint, we accept as true its well-pleaded factual allegations.  *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 487 (9th Cir. 2019).

commitment lasted more than nine months,[2] ending in August 2000. Plaintiff was seventeen years old at the time of commitment, and his commitment spanned his eighteenth birthday.

Since his release from commitment in 2000, Plaintiff has earned a GED, a bachelor's degree, and a master's degree. He is gainfully employed and a father to two children. According to the complaint, he no longer suffers from mental illness, and he lives "a socially-responsible, well-balanced, and accomplished life."

As a result of Plaintiff's involuntary commitment, Washington law prohibited him from possessing a firearm. Wash. Rev. Code § 9.41.040(2)(a)(iv). Washington law, though, allows persons to petition for relief from that prohibition if they meet certain conditions. *Id.* § 9.41.047(3)(a). In 2014, Plaintiff successfully petitioned a Washington state court for relief. The court found, pursuant to the requirements of Washington law, that "(1) [Plaintiff] is no longer required to participate in court-ordered inpatient or outpatient treatment; (2) [Plaintiff] has successfully managed the condition related to his commitment; (3) [Plaintiff] no longer presents a substantial danger to himself, or the public; and (4) [t]he symptoms related to the commitment are not reasonably likely to recur." *See id.* § 9.41.047(3)(c) (requiring those findings). Accordingly, the relevant state law no longer prohibits Plaintiff from possessing a firearm.

---

[2] The record strongly suggests that a state court committed Plaintiff involuntarily three separate times during the nine-month period in 1999 and 2000. The complaint is ambiguous on this point. Because the number of commitments does not alter the analysis, we assume that a state court committed Plaintiff involuntarily only once, for a period of nine months.

But, as a result of his involuntary commitment, *federal* law prohibits Plaintiff from possessing a firearm.  Title 18 U.S.C. § 922(g)(4) bars individuals who have been "committed to a mental institution" from possessing firearms.[3]  Federal regulations make clear that the prohibition does not apply to "a person in a mental institution for observation or a voluntary admission to a mental institution."  27 C.F.R. § 478.11.  Involuntary commitments comport with due process only when the individual is found to be *both* mentally ill *and* dangerous.  *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).  Additionally, commitments under state-law procedures that lack robust judicial involvement do not qualify as commitments for purposes of § 922(g)(4).  *United States v. Rehlander*, 666 F.3d 45, 47–49 (1st Cir. 2012).  We agree with the parties that Plaintiff's involuntary commitment by the Washington state court—which found Plaintiff to be both mentally ill and dangerous—qualifies as a "commitment" for purposes of § 922(g)(4).  Section 922(g)(4), then, bars Plaintiff from possessing a firearm.

Federal law provides two potential avenues for relief from the § 922(g)(4) bar but, as explained below, neither avenue is currently available to Plaintiff.

First, under 18 U.S.C. § 925(c), Plaintiff may apply to the United States Attorney General "for relief from the disabilities imposed by Federal laws with respect to the . . .

---

[3] "It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . [to] possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(4).

possession of firearms."[4]  Beginning in 1986, that provision
extended to persons who had been involuntarily committed to
a mental institution.  Firearms Owners' Protection Act, Pub.
L. 99-308, § 105, 100 Stat. 449 (1986).  The Attorney
General may, but is not required to, grant relief "if it is
established to his satisfaction that the circumstances
regarding the disability, and the applicant's record and
reputation, are such that the applicant will not be likely to act
in a manner dangerous to public safety and that the granting
of the relief would not be contrary to the public interest."  *Id.*;
*see United States v. Bean*, 537 U.S. 71, 77 (2002) (noting the
discretionary nature of the decision and observing that relief

---

[4] Section 925(c) provides, in relevant part:

> A person who is prohibited from possessing . . .
> firearms or ammunition may make application to the
> Attorney General for relief from the disabilities
> imposed by Federal laws with respect to the . . .
> possession of firearms, and the Attorney General may
> grant such relief if it is established to his satisfaction
> that the circumstances regarding the disability, and the
> applicant's record and reputation, are such that the
> applicant will not be likely to act in a manner
> dangerous to public safety and that the granting of the
> relief would not be contrary to the public interest.  Any
> person whose application for relief from disabilities is
> denied by the Attorney General may file a petition with
> the United States district court for the district in which
> he resides for a judicial review of such denial.  The
> court may in its discretion admit additional evidence
> where failure to do so would result in a miscarriage of
> justice. . . .  Whenever the Attorney General grants
> relief to any person pursuant to this section he shall
> promptly publish in the Federal Register notice of such
> action, together with the reasons therefor.

may be denied "even when the statutory prerequisites are satisfied").

That statutory option, however, is currently foreclosed to Plaintiff and all others.  Since 1992, Congress has prohibited the use of funds "to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. [§ ]925(c)."  *Bean*, 537 U.S. at 74–75 (alteration in original) (quoting Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732 (1992)); *see also id.* at 75 n.3 (citing later appropriations acts with the same prohibition); *Hatfield v. Barr*, 925 F.3d 950, 952 (7th Cir. 2019) ("[S]ince 1992 Congress has withheld funds to implement § 925(c)."). Congress defunded the program because, among other reasons, determining eligibility had proved to be a "very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made."  S. Rep. No. 102-353, at 19 (1992).  Accordingly, unless Congress chooses in the future to fund the federal program, any application by Plaintiff for relief pursuant to § 925(c) would be futile.  *See Bean*, 537 U.S. at 76 (holding that, while funding is withheld, judicial review is also unavailable).

Plaintiff's second potential avenue for relief is through a state program that qualifies under 34 U.S.C. § 40915.  To qualify, the state's program must "permit[] a person who, pursuant to State law, . . . has been committed to a mental institution, to apply to the State for relief from the disabilities imposed by" 18 U.S.C. § 922(g)(4) and other laws.  *Id.* § 40915(a)(1).  The program also must provide

that a State court, board, commission, or other
lawful authority shall grant the relief, pursuant
to State law and in accordance with the
principles of due process, if the circumstances
regarding the disabilities . . . , and the
person's record and reputation, are such that
the person will not be likely to act in a manner
dangerous to public safety and that the
granting of the relief would not be contrary to
the public interest.

*Id.* § 40915(a)(2). Finally, the program must allow a person
to petition the state court "for a de novo judicial review of [a]
denial." *Id.* § 40915(a)(3). For a person granted relief under
a qualifying state program, § 922(g)(4)'s prohibition on the
possession of firearms does not apply. *Id.* § 40915(b).

According to the government, "approximately thirty
States" have created qualifying programs. *See also* Bureau of
Justice Statistics, *State Profiles: NICS Act Record
Improvement Program (NARIP) Awards FY 2009–2018*,
https://www.bjs.gov/index.cfm?ty=tp&tid=491 (providing
state-by-state information suggesting that thirty states and one
tribe have qualifying programs). As noted above,
Washington law provides a mechanism for persons to petition
for relief from the state-law prohibition on the possession of
firearms. But that mechanism does not qualify under § 40915
because, among other reasons, the factual findings required
by Washington law differ from the factual findings required
by § 40915. Washington law requires a finding that the
person "no longer presents a *substantial danger* to himself or
herself, or the public." Wash. Rev. Code § 9.41.047(3)(c)(iii)
(emphasis added). By contrast, the federal standard requires
a determination that "the person will not be likely to act in a

manner *dangerous* to public safety." 34 U.S.C. § 40915(a)(2) (emphasis added). Additionally, § 40915(a)(2) requires a finding that granting "relief would not be contrary to the public interest," while Washington law requires no such inquiry. In other words, the federal standard is more stringent than the Washington standard. Accordingly, unless Washington chooses in the future to create a program that meets the requirements of § 40915, Plaintiff has no avenue for relief from § 922(g)(4)'s prohibition.

Plaintiff filed this action in 2017 after he was denied the purchase of a firearm because of § 922(g)(4). He alleges that the Department of Justice; the United States Attorney General; the Federal Bureau of Investigation; and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (collectively, "the government") violated his Second Amendment right to bear arms and his Fifth Amendment right to due process by prohibiting him from possessing firearms.

The government moved to dismiss the complaint for failure to state a claim. The district court granted that motion, holding that § 922(g)(4) is categorically constitutional under the Second Amendment and, alternatively, that § 922(g)(4) satisfies intermediate scrutiny. The court also rejected Plaintiff's due process claim. Plaintiff then sought leave to amend the complaint, which the court denied as futile. Plaintiff timely appeals.

## STANDARD OF REVIEW

We review de novo a district court's decision to grant a motion to dismiss, *Nayab*, 942 F.3d at 487, as well as a challenge to the constitutionality of statutes, *United States v. Torres*, 911 F.3d 1253, 1257 (9th Cir. 2019). "When a

district court determines that further amendment would be
futile, we will affirm the district court's dismissal on this
basis if it is clear, upon de novo review, that the complaint
could not be saved by any amendment." *Curry v. Yelp Inc.*,
875 F.3d 1219, 1228 (9th Cir. 2017) (internal quotation marks
omitted).

## DISCUSSION

As this case reaches us, Plaintiff advances only his
Second Amendment claim.  He argues that the Second
Amendment requires that he be allowed to possess firearms
notwithstanding his earlier involuntary commitment.  He does
not specify the standard by which federal courts should
measure whether persons, like Plaintiff, are sufficiently
rehabilitated for purposes of the Second Amendment.
Notably, though, Plaintiff does not seek the application of the
substantive standards defined in 34 U.S.C. § 40915.  He has
never asserted, for example, an equal-protection claim that,
because persons in thirty other states benefit from programs
applying § 40915's substantive standards, he too is entitled
to relief or to an opportunity to meet those standards.  Nor
has he advanced, on appeal, an argument that due process
demands the same results.  *See Smith v. Marsh*, 194 F.3d
1045, 1052 (9th Cir. 1999) (holding that arguments not raised
in the opening brief are forfeited).  We therefore do not
consider whether those theories have merit, and we turn to the
only claim on appeal:  whether the Second Amendment
requires that Plaintiff be allowed to possess firearms.

The "Second Amendment protects the right to keep and
bear arms for the purpose of self-defense." *McDonald v. City
of Chicago*, 561 U.S. 742, 749–50 (2010).  But the right is
"not unlimited." *District of Columbia v. Heller*, 554 U.S.

570, 595 (2008).  The Supreme Court clarified that its recognition of the Second Amendment right does not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626–27; *accord McDonald*, 561 U.S. at 786.  Those prohibitions are "presumptively lawful."  *Heller*, 554 U.S. at 627 n.26.

Applying the lessons from *Heller* and *McDonald*, we have adopted a two-step inquiry for assessing whether a law violates the Second Amendment.  *Torres*, 911 F.3d at 1258. "This test '(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny.'"  *Id.* (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)).

Whether § 922(g)(4)'s prohibition on the possession of firearms by persons who have been committed to a mental institution comports with the Second Amendment is an issue of first impression in this circuit.  But we are guided by our previous decisions in related contexts.  *See, e.g.*, *id.* at 1264 (holding that § 922(g)(5)'s prohibition on the possession of firearms by unlawful aliens survives intermediate scrutiny); *Chovan*, 735 F.3d at 1142 (holding that § 922(g)(9)'s prohibition on the possession of firearms by persons previously convicted of a domestic violence misdemeanor survives intermediate scrutiny); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (holding that § 922(g)(1)'s prohibition on the possession of firearms by felons comports with the Second Amendment).

Decisions by the Third and Sixth Circuits addressing § 922(g)(4) also inform our analysis. Those courts have addressed challenges remarkably similar to Plaintiff's challenge here and have reached opposite conclusions. In both *Beers v. Attorney General*, 927 F.3d 150, 152 (3d Cir. 2019), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Jan. 9, 2020) (No. 19-864), and *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 683–84 (6th Cir. 2016) (en banc), a state court had committed the plaintiff many years ago to a mental institution but, according to the plaintiff, he was now free of mental illness. In both cases, the plaintiff argued that, as applied to him, § 922(g)(4)'s prohibition violated the Second Amendment.

The Third Circuit rejected the claim, concluding that § 922(g)(4) did not burden conduct protected by the Second Amendment. *Beers*, 927 F.3d at 159. Accordingly, the plaintiff's alleged return to mental health was irrelevant to the constitutional analysis. *Id.*

By contrast, the Sixth Circuit reversed the district court's dismissal of the claim and remanded for further proceedings. *Tyler*, 837 F.3d at 699. The court first concluded that § 922(g)(4) burdened Second Amendment rights and that intermediate scrutiny applied. *Id.* at 688–93. The court then held that § 922(g)(4) did not survive intermediate scrutiny as applied to the plaintiff because the government had failed to show that a *lifetime* prohibition on the possession of firearms was a reasonable fit with the goals of reducing crime and suicide. *Id.* at 693–99.

We turn, then, to our own analysis.

14                    MAI V. UNITED STATES

A.  *Asking  Whether  §  922(g)(4)  Burdens  Second
    Amendment Rights*

We first ask whether the statute at issue "burdens conduct
protected by the Second Amendment." *Torres*, 911 F.3d
at 1258 (quoting *Chovan*, 735 F.3d at 1136). This inquiry
"requires us to explore the amendment's reach based on a
historical  understanding  of  the  scope  of  the  Second
Amendment right." *Id.* (internal quotation marks and
brackets  omitted).    A  law  does  not  burden  Second
Amendment rights "if it either falls within one of the
'presumptively lawful regulatory measures' identified in
*Heller* or regulates conduct that historically has fallen outside
the scope of the Second Amendment." *Id.* (some internal
quotation marks omitted).

The government has presented a strong argument that
both of those inquiries support the conclusion that § 922(g)(4)
does not burden Second Amendment rights.  The Supreme
Court identified as presumptively lawful the "longstanding
prohibitions on the possession of firearms by felons and the
mentally ill." *Heller*, 554 U.S. at 626.  In *Vongxay*, 594 F.3d
at 1114–15, we held that § 922(g)(1)—the federal prohibition
on the possession of firearms by felons—fell within *Heller*'s
"presumptively lawful" category. Like the federal prohibition
as to felons, § 922(g)(4) had been on the books for decades
when the Court decided *Heller*.  Similarly, historical evidence
supports the view that society did not entrust the mentally ill
with  the  responsibility  of  bearing  arms.  *See, e.g.*, *Beers*,
927 F.3d at 157–58 (summarizing the historical evidence).

Plaintiff responds by re-framing the inquiry.  He concedes
that a prohibition as to those persons who are *presently*
mentally ill and dangerous does not implicate the Second

Amendment.  But he reads both *Heller* and the historical evidence as limited to that circumscribed category:  those who are presently mentally ill.  He urges us to agree with the Sixth Circuit that "historical evidence . . . does not directly support the proposition that persons who were once committed due to mental illness are forever ineligible" to possess a firearm.  *Tyler*, 837 F.3d at 689.

We need not decide which perspective better comports with the historical evidence.  Instead, we follow the "well-trodden and 'judicious course'" taken by our court in many recent cases.  *Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018) (quoting *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013)), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Dec. 28, 2018) (No. 18-843).  We assume, without deciding, that § 922(g)(4), as applied to Plaintiff, burdens Second Amendment rights.

## B.  *Determining the Appropriate Level of Scrutiny*

We next "determine the appropriate level of scrutiny to apply." *Torres*, 911 F.3d at 1262.  "[L]aws burdening Second Amendment rights must withstand more searching scrutiny than rational basis review."  *Id.*   The precise level of heightened scrutiny depends "on (1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (internal quotation marks omitted).  "[T]here has been near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Torres*, 911 F.3d at 1262 (internal quotation marks omitted). Strict scrutiny applies only to laws that both implicate a core

Second Amendment right and place a substantial burden on that right. *Id.*

As Plaintiff recognizes, intermediate scrutiny applies here. "[T]he core of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Chovan*, 735 F.3d at 1138 (quoting *Heller*, 554 U.S. at 635). In *Chovan*, we concluded that, regardless of present-day rectitude, a person convicted long ago of a domestic-violence misdemeanor was not a "law-abiding, responsible citizen." *Id.* That same logic extends here: Regardless of present-day peaceableness, a person who required formal intervention and involuntary commitment by the State because of the person's dangerousness is not a "law-abiding, responsible citizen." Section 922(g)(4)'s prohibition thus falls well outside the core of the Second Amendment right. *Id.*

We recognize that the burden that § 922(g)(4)'s prohibition places on Plaintiff is "quite substantial." *Id.* Unless Congress or the Washington legislature enacts a program relieving him from § 922(g)(4)'s prohibition, the law "amounts to a 'total prohibition' on firearm possession for [Plaintiff]—in fact, a 'lifetime ban.'" *Id.* But we agree with the Sixth Circuit that, "[l]ike the other provisions of § 922(g), § 922(g)(4) does not burden the public at large; it burdens only a narrow class of individuals who are not at the core of the Second Amendment—those . . . previously involuntarily committed." *Tyler*, 837 F.3d at 691. Just as intermediate scrutiny applies to the other lifetime bans in § 922(g), so too does intermediate scrutiny apply to § 922(g)(4)'s prohibition. *See, e.g.*, *Chovan*, 735 F.3d at 1138 (applying intermediate scrutiny to § 922(g)(9)'s prohibition on the possession of firearms by those previously convicted of the misdemeanor

of domestic violence); *see also Tyler*, 837 F.3d at 691–92 (collecting cases from other circuits that have applied intermediate scrutiny to lifetime bans imposed by § 922(g)).

In conclusion, we join the Sixth Circuit—the only other circuit court to have addressed the issue—in holding that intermediate scrutiny applies here.  *Tyler*, 837 F.3d at 690–92.

## C.  *Applying Intermediate Scrutiny*

To satisfy intermediate scrutiny, the government's statutory objective must be "significant, substantial, or important," and there must be a "reasonable fit" between the challenged law and that objective.  *Silvester v. Harris*, 843 F.3d 816, 821–22 (9th Cir. 2016) (internal quotation marks omitted).  "A statute need not utilize the least restrictive means of achieving its interest in order to withstand intermediate scrutiny."  *Torres*, 911 F.3d at 1263 (internal quotation marks omitted).  "Instead, the statute simply needs to promote a substantial government interest that would be achieved less effectively absent the regulation."  *Id.* (brackets and internal quotation marks omitted).

Here, two important interests support § 922(g)(4)'s ban on the possession of firearms by those who were involuntarily committed to a mental institution:  preventing crime and preventing suicide. *See Washington v. Glucksberg*, 521 U.S. 702, 730–35 (1997) (recognizing the government's "unquestionably important" interest in preventing suicide); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (internal quotation marks omitted)); *Torres*, 911 F.3d at 1263 (holding that the

government's interests in crime control and public safety are
"important"). We agree with the Sixth Circuit that those two
interests "are not only legitimate, they are compelling."[5]
*Tyler*, 837 F.3d at 693.

Congress' reasoning is straightforward. Firearms
undoubtedly exacerbate acts of violence to others. *Bonidy v.
U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015).
Firearms also greatly increase the risk of death by suicide.
*See, e.g.*, Matthew Miller & David Hemenway, *Guns and
Suicide in the United States*, 359 New Eng. J. Med. 989, 990
(2008) ("A suicide attempt with a firearm rarely affords a
second chance. Attempts involving drugs or cutting, which
account for more than 90% of all suicidal acts, prove fatal far
less often."); *id.* at 991 (discrediting as "invalid" the specious
belief that "anyone who is serious enough about suicide to
use a gun would find an equally effective means if a gun were
not available"); *id.* (concluding that "the availability of lethal
means . . . can make the difference between life and death").

In enacting § 922(g)(4) and related restrictions, "Congress
sought to . . . keep guns out of the hands of those who have
demonstrated that they may not be trusted to possess a
firearm without becoming a threat to society." *Dickerson v.
New Banner Inst., Inc.*, 460 U.S. 103, 112 (1983) (quoting
*Lewis v. United States*, 445 U.S. 55, 63 (1980)), *superseded
in other part by statute, as stated in Logan v. United States*,
552 U.S. 23, 27–28 (2007); *accord Small v. United States*,
544 U.S. 385, 393 (2005); *Lewis v. United States*, 445 U.S.

---

[5] Because we determine that § 922(g)(4) is a reasonable fit for the
government's interest in preventing suicide, we need not and do not
address whether the statute is also a reasonable fit for the government's
interest in preventing crime.

55, 63 (1980); *Scarborough v. United States*, 431 U.S. 563, 572 (1977). Put more succinctly, "Congress' intent in enacting [§] 922(g) and [related laws] was to keep firearms out of the hands of presumptively risky people." *Dickerson*, 460 U.S. at 112 n.6. Accordingly, although § 922(g)(4)'s prohibition takes effect as a result of a *past* event, the statute "target[s] a *present* danger, i.e., the danger posed by [those who previously have been involuntarily committed to a mental institution] who bear arms." *Vartelas v. Holder*, 566 U.S. 257, 271 (2012) (emphasis added).

The Second Amendment allows categorical bans on groups of persons who presently pose an increased risk of violence. *See, e.g.*, *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) ("[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons . . . ."). For example, we upheld the constitutionality of § 922(g)(9)'s ban on the possession of firearms by domestic violence misdemeanants because that category of persons has a high rate of domestic violence recidivism and because the use of firearms by domestic abusers causes more deaths. *Chovan*, 735 F.3d at 1140–41. And we upheld the constitutionality of § 922(g)(5)'s ban on the possession of firearms by unlawful aliens because that category of persons has "an inherent incentive to . . . evade law enforcement" and, if armed, "could pose a threat to immigration officers or other law enforcement." *Torres*, 911 F.3d at 1264.

Similarly, in enacting § 922(g)(4), Congress determined that, like felons and domestic-violence assailants, those who have been involuntarily committed to a mental institution also pose an increased risk of violence. As we explain below,

scientific evidence amply supports that congressional judgment. Section 922(g)(4)'s prohibition is therefore a reasonable fit for the government's laudable goal of preventing gun violence.

Plaintiff does not challenge that conclusion as a general matter. Indeed, he concedes that § 922(g)(4)'s prohibition justifiedly applied to him originally. Instead, Plaintiff brings an as-applied challenge only. He argues that the *continued* application of the prohibition to him is *no longer* justified because of the passage of time and his alleged mental health and peaceableness in recent years. For the reasons that follow, we disagree.

1. *Scientific Evidence Reasonably Supports Congress' Judgment.*

The scientific evidence cited by the government shows an increased risk of violence for those who have been released from involuntary commitment. For example, the authors of one meta-analysis surveyed the available scientific literature that studied the relationship between a history of mental illness and the risk of suicide. E. Clare Harris & Brian Barraclough, *Suicide as an Outcome for Mental Disorders: A Meta-Analysis*, 170 Brit. J. Psychiatry 205 (1997) [hereinafter *Suicide Meta-Analysis*]. The authors found that studies of persons released from involuntary commitment reported a combined "suicide risk *39 times* that expected."[6] *Id.* at 220 (emphasis added). That extraordinarily increased risk of

---

[6] The authors defined the "expected" rate of suicide as either the rate calculated by the authors of the individual study or the background rate for the general population of the relevant country, controlling for years of the study, age, and gender. *Suicide Meta-Analysis*, *supra*, at 205.

suicide clearly justifies the congressional judgment that those released from involuntary commitment pose an increased risk of suicide.

Plaintiff correctly points out that the scientific evidence is not a perfect match for his circumstances. For example, although suicide risk following release from commitment is extremely high, the risk "seems highest" initially and "diminishes thereafter." *Id.* at 223. Furthermore, the studies followed the outcomes of those released from involuntary commitment for up to 8.5 years, whereas Plaintiff was released from involuntary commitment two decades ago. Channeling the Sixth Circuit's analysis, Plaintiff urges us to conclude that the government's cited studies are insufficient to support the congressional judgment that he poses an increased risk of suicide. *Tyler*, 837 F.3d at 695–96.

We disagree. In assessing congressional judgment, "we do not impose an 'unnecessarily rigid burden of proof,' and we allow [the government] to rely on any material 'reasonably believed to be relevant' to substantiate its interests." *Pena*, 898 F.3d at 979 (quoting *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017)). That standard applies because "we are weighing a legislative judgment, not evidence in a criminal trial." *Id.* Thus, we do not require "scientific precision." *Id.* at 984. We ask only whether the evidence "fairly supports" Congress' "reasonable" conclusions. *Id.* at 979–80 (quoting *Jackson v. City of San Francisco*, 746 F.3d 953, 969 (9th Cir. 2014)); *see also Jackson*, 746 F.3d at 969 (holding that, even if the relevant science were "an open question," that conclusion "is insufficient to discredit [a legislative body's] reasonable conclusions"). When empirical evidence is incomplete, we "must accord substantial deference to the predictive

judgments of Congress." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994). "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Id.*

Scientific studies show an ever-present increased risk of violence for those who were committed involuntarily, even well after they are released. We cannot conclude that, because no one apparently has published a study beyond 8.5 years after the participants' release from involuntary commitment, Congress may not infer that the increased risk of violence continues after that time period. Importantly, the studies did not show merely a slight increase in risk for those involuntarily committed; the studies reported "a suicide risk *39 times* that expected." *Suicide Meta-Analysis*, *supra*, at 220 (emphasis added). It was well within Congress' legislative discretion to predict that the increased risk would not plummet to *zero* in later years.

Closely related studies confirm that suicide risk remains extremely high for those with a history of mental illness, even when studies continue beyond a decade after treatment. "Previously hospitalised patients" were studied for "up to 15 years after discharge from in-patient treatment," and they had "a suicide risk seven times that expected." *Id.* at 221. "Community care patients" were studied for up to 12 years, and they had a "suicide risk almost 13 times that expected." *Id.* "Out-patients" were studied for up to 12 years, and they had "a suicide risk 18 times that expected." *Id.* Studies that did not differentiate between the types of treatment that patients received were conducted for up to 15 years and reported "a suicide risk 11 times that expected." *Id.*

In sum, although the scientific evidence suggests that Plaintiff's increased risk of suicide decreases over time, nothing suggests that it ever dissipates entirely.[7]  Scientific evidence thus fairly supports the congressional judgment that those who have been involuntarily committed to a mental institution continue to pose an increased risk of violence even many years after their release from commitment.  *See Chovan*, 735 F.3d at 1142 (rejecting an as-applied challenge to § 922(g)(9)'s prohibition on a domestic violence misdemeanant because he had not "directly proved that if a domestic abuser has not committed domestic violence for fifteen years, that abuser is highly unlikely to do so again").

Plaintiff has asserted that, because *he* was released from commitment years ago, no longer suffers from mental illness, and has been peaceable in recent years, the Second Amendment requires that he be allowed to possess firearms.  But we emphasize that we are assessing congressional judgment about a category of persons, not about Plaintiff himself.  As described above, scientific evidence reasonably supports the congressional judgment about that category of persons.  We agree with the Sixth Circuit that the Second Amendment does not demand "an individualized hearing" to assess Plaintiff's own personal level of risk.  *Tyler*, 837 F.3d at 698 n.18; *see also Torres*, 911 F.3d at 1264 n.6 (holding

---

[7] In other contexts, scientific consensus exists that, over time, a particular increased risk dissolves entirely.  For example, the American Cancer Society reports that, fifteen years after quitting smoking, a former smoker's "risk of coronary heart disease is that of a non-smoker's."  Am. Cancer Soc'y, *Benefits of Quitting Smoking Over Time*, https://www.cancer.org/healthy/stay-away-from-tobacco/benefits-of-quitting-smoking-over-time.html.  We have located nothing similar in the present context.

that, under intermediate scrutiny, some amount of over-inclusiveness for a firearms prohibition is permissible).

But even if we were to consider his personal situation, Plaintiff's own anecdotal evidence of his psychological evaluations in 2014 confirms what the scientific literature explains: Although his present level of risk is lower than it was around the time of his commitment, his history of mental illness remains a scientifically recognized factor in evaluating his current level of risk. One of Plaintiff's doctors wrote that a history of mental illness is "associated with higher risk of aggression." Plaintiff's results on one psychological test showed less of a risk than "the base rate for individuals with a psychiatric history"; one doctor concluded that he has a "low risk for future violence"; and another doctor concluded that he does not "represent[] a significant suicide risk." But nothing in the record suggests that Plaintiff's level of risk is nonexistent or that his level of risk matches the risk associated with a similarly situated person who lacks a history of mental illness.

## 2. *Congress Has Not Reconsidered Its Judgment.*

Congress' 2008 enactment of 34 U.S.C. § 40915 does not affect our analysis. As described above, § 40915 allows states to create their own "relief from disabilities" programs. The Sixth Circuit held that § 40915 "is a clear indication that Congress does not believe that previously committed persons are sufficiently dangerous as a class" to prohibit them from possessing firearms. *Tyler*, 837 F.3d at 697. We understand Congress' enactment of § 40915 differently.

Congress enacted § 40915 as part of the NICS Improvement Amendments Act of 2007 ("NIAA"), 34 U.S.C.

§§ 40902–40941. As its name suggests, the NIAA aimed to improve the National Instant Criminal Background Check System ("NICS"), the federal background-check system that includes a database listing persons who have been disqualified from possessing firearms. *Id.* § 40902. Congress passed the NIAA in response to horrible acts of gun violence by those with a history of mental illness. *Id.* § 40902(8)–(9). All of the NIAA's substantive provisions other than § 40915 seek to improve the information contained in the federal database. *See, e.g.*, *id.* § 40911 (requiring federal agencies to share information); *id.* §§ 40912–40914 (encouraging states to share information).

The NIAA was a political compromise that included § 40915's avenue for relief for some of the least dangerous only in exchange for greatly improved enforcement as to all the rest, including the most dangerous.[8] Congress' statutory extension of grace to some persons as part of a political compromise aimed at preventing gun violence does not affect our constitutional analysis. We do not read the NIAA as disturbing the longstanding congressional judgment— supported by scientific evidence—that those who were

---

[8] *See, e.g.*, 153 Cong. Rec. 15,676 (2007) ("In order to move the legislation to the floor, it was necessary to make some accommodations [including the addition of § 40915] to incorporate the concerns of gun owners." (statement of Rep. Conyers)); *id.* at 15,677 ("This legislation represents a true compromise . . . [with] two diverse groups . . . , the NRA and the Brady Group, coming together to help work out this legislation, and both had some benefits from it." (statement of Rep. Castle)); *accord* 153 Cong. Rec. 36,338 (2007) ("[T]his compromise legislation . . . respects the rights of gun owners and, at the same time, makes sure that the NICS system will work more effectively." (statement of Sen. Leahy)).

involuntarily committed to a mental institution pose an increased risk of violence even years after their release.[9]

### 3. *Section 922(g)(4) Is a Reasonable Fit for Preventing Suicide.*

To meet intermediate scrutiny, the government must demonstrate that § 922(g)(4) is a "reasonable fit" for the goal of reducing gun violence. *Torres*, 911 F.3d at 1263. As described above, Congress reasonably concluded that restricting firearms from persons with an increased risk of violence advances the goal of reducing gun violence. Section 922(g)(4) thus appears to be a "reasonable fit" for the government's important interest. *See id.* (holding that, to meet intermediate scrutiny, a "statute simply needs to promote a substantial government interest that would be achieved less effectively absent the regulation." (brackets and internal quotation marks omitted)).

But we also must consider the availability, or unavailability, of avenues of relief from categorical, lifetime bans. *Fisher v. Kealoha*, 855 F.3d 1067, 1071 (9th Cir. 2017) (per curiam); *Chovan*, 735 F.3d at 1142. Plaintiff presently

---

[9] Nor could Congress' extension of grace to some persons alter the meaning of the Second Amendment. Like many constitutional provisions, the Second Amendment establishes a floor below which Congress may not legislate. But if Congress chooses to legislate well above that floor—for example, by allowing categories of persons to possess firearms even though Congress could restrict possession—that legislation has no effect on the meaning of the Second Amendment. *See, e.g.*, *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (holding that "the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard" and noting the existence of many laws that legislate above that constitutional minimum).

has no avenue for seeking relief from § 922(g)(4)'s prohibition.   Unless Congress funds the "relief from disabilities" program defined in § 925(c) or the Washington legislature creates a "relief from disabilities" program pursuant to § 40915,[10] federal law prohibits Plaintiff from possessing a firearm.  This case thus differs from challenges to other lifetime bans imposed by § 922(g), because those provisions allow persons to seek relief from the lifetime ban in certain circumstances.  *See, e.g.*, *Chovan*, 735 F.3d at 1142 (noting the avenues for relief, such as a gubernatorial pardon, available to domestic-violence misdemeanants).

Several factors lead us to conclude that § 922(g)(4) nevertheless remains a reasonable fit for the congressional goal of reducing gun violence.   First, the governmental interest at stake is compelling.  The statute does not merely aim to protect financial interests.  Nor is the statute merely a modest, incremental improvement in fighting crime.  *See, e.g.*, *Pena*, 898 F.3d at 981–86 (upholding the constitutionality of a law requiring some firearms to "microstamp" identifying information onto discharged bullets).  The interest at stake here is preventing horrific acts of violence.  Suicide affects not only its immediate victim; family members, friends, and the community as a whole suffer immensely.  Even a small decrease in the number of suicides is, therefore, a significant public benefit.

---

[10] That possibility is not fanciful.  Soon after the Third Circuit rejected the plaintiff's challenge to § 922(g)(4) in *Beers*, 927 F.3d 150, the federal government approved Pennsylvania's state program under § 40915.  Petition for cert. 23 (U.S. Jan. 9, 2020) (No. 19-864).  The plaintiff in *Beers* is "now licensed to possess a firearm and has obtained one." *Id.*

Second, as discussed above, the scientific evidence strongly suggests that the increased risk is not tiny. The available studies, though an imperfect match for Plaintiff's precise circumstances, have found that those released from involuntary commitment are 39 times more likely to commit suicide than those not previously committed.

Finally, § 922(g)(4)'s prohibition as to those who were committed involuntarily applies not to persons who *theoretically* might be dangerous at some point in their lives. Instead, it applies only to those who were found, through procedures satisfying due process, *actually* dangerous in the past.[11]   By limiting the prohibition to those with a demonstrated history of dangerousness, § 922(g)(4) is more narrowly tailored than other lifetime prohibitions that we have upheld, such as § 922(g)(1)'s prohibition as to felons, both violent and non-violent. *See United States v. Phillips*, 827 F.3d 1171, 1175–76 (9th Cir. 2016) (upholding § 922(g)(1)'s lifetime ban as applied to someone convicted of the "non-violent" felony of misprision).

In sum, we hold that § 922(g)(4)'s prohibition on those who have been involuntarily committed to a mental institution is a reasonable fit for the important goal of reducing gun violence. The district court therefore correctly granted the government's motion to dismiss. Because the factual allegations in the proposed amended complaint do not affect our analysis, the district court correctly denied, as futile, Plaintiff's motion for leave to amend the complaint.

---

[11] As applied to Plaintiff, a state court found him dangerous at least once, and possibly three times. *See supra*, note 2.

CONCLUSION

The federal prohibition on Plaintiff's possession of firearms because of his past involuntary commitment withstands Second Amendment scrutiny.  Those who are no longer mentally ill, but who were committed involuntarily years ago, unquestionably pose less of a risk of violence now than when a state court found them to be mentally ill and dangerous.  But scientific evidence reasonably supports the congressional judgment that they nevertheless still pose an increased risk of violence.  The Second Amendment allows Congress to further its goal of preventing gun violence by barring Plaintiff from possessing a firearm.

We emphasize that we reach only Plaintiff's Second Amendment challenge and that our holding is limited to § 922(g)(4)'s prohibition on those who have "been committed to a mental institution."  We emphatically do not subscribe to the notion that "once mentally ill, always so."  We accept, as we must and as we have no reason to doubt, that Plaintiff is no longer mentally ill.  We decide only that § 922(g)(4)'s application to him withstands Second Amendment scrutiny.

**AFFIRMED.**